# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

George Dunning, Jr., *et al.*,                                   Case No. 1:14cv932

      Plaintiffs,                                                     Judge Michael R. Barrett

           v.

Judith A. Varnau, *et al.*,

      Defendants.

## OPINION & ORDER

This matter is before the Court upon Defendant Brown County and the Brown County Board of County Commissioner's ("Brown County") Motion to Dismiss. (Doc. 12). Also before the Court is Defendants Judith and Dennis Varnau's ("the Varnuas") Motion to Dismiss. (Doc. 14). These motions have been fully briefed. (Docs. 23, 24, 25, 27).

## I.   BACKGROUND

This case arises from the Brown County Coroner's investigation and determination of the cause of death of Zachary Goldson, an inmate found dead in his cell at the Brown County Jail. The following facts are contained in the Amended Complaint. (Doc. 10).

Dwayne Wenninger is the Brown County Sheriff. (Doc. 10, ¶ 9). In 2008, Defendant Dennis Varnau ran against Wenninger and was unsuccessful in removing him from office, losing both the election and a series of legal challenges against Wenninger.[1]

---

[1]Varnau filed a protest against Wenninger's candidacy, claiming that Wenninger failed to meet certain requirements when he originally ran for sheriff in 2000. The board of elections denied his protest and he proceeded to seek a writ of mandamus to compel the board to accept the protest. The writ was dismissed by the Brown County Court of Common Pleas because

(Id., ¶¶ 10-11).

In November 2012, Defendant Dr. Judith Varnau, Dennis Varnau's wife, was elected Brown County Coroner.  (Id., ¶ 13).  Plaintiffs claim that before becoming coroner, Dr. Varnau did not have any formal anatomical, clinical or forensic pathology experience.  (Id.)  Dr. Varnau has authorized her husband Dennis to act on her behalf. (Id., ¶ 4).

Zachary Goldson was arrested on September 26, 2013 for possessing a shortened .22 caliber firearm.  (Id., ¶ 18).  Before his arrest, Goldson planned to harm himself, even specifying what shoes he wanted to be buried in.  (Id., ¶ 19).  Goldson knew several law enforcement agencies were investigating him for his involvement in other crimes, including ten felony charges related to burglary, theft, receiving stolen property and possession of controlled substances.  (Id.)

On October 4, 2013, Goldson was taken to the Southwest Regional Medical Center ("SRMC") after he swallowed a pen, toothbrush and plastic tube.  (Id., ¶ 20). Once the objects were removed, Goldson was returned to jail and placed on medical watch.  (Id.)  Goldson was placed in a cell away from the general population although, unbeknownst to Plaintiffs, Goldson suffered from anxiety anytime he was left alone.[2]

---

there was a legal remedy available through a quo warranto action and because Varnau's protest violated Ohio Rev. Code § 3513.05. The Twelfth Appellate District affirmed the dismissal.

After Wenninger won the election, in February of 2009, Varnau filed a complaint for a writ of quo warranto to the court of appeals.  Varnau sought to remove Wenninger from office and replace Wenninger with himself as sheriff, claiming he was the only lawful candidate in the 2008 election.  *In State ex rel. Varnau v. Wenninger*, Brown App. No. CA2009-02-010, 2010-Ohio-3813.  The court of appeals denied the writ because it was untimely and granted summary judgment.  The Ohio Supreme Court affirmed the court of appeals' decision.

[2]Letters taken from Goldson's cell included statement such as:

2

(Id., ¶ 21).

Due to continued complaints about his abdomen, Plaintiff Bradley "Zane" Schadle arranged for Deputy Travis Justice to take Goldson back to SRMC. (Id., ¶ 22). SRMC referred Goldson to Anderson Mercy Hospital for further treatment. (Id.) On the walk back to the police cruiser at SRMC, Goldson unlocked his handcuffs and shackles and struck Deputy Justice from behind. (Id., ¶ 23). Goldson then cut Deputy Justice near his left eye, attempted to gain control of his firearm and pinned him to the ground. (Id.) Four hospital staff members witnessed the altercation, called 9-1-1 to report a fight and then proceeded to help restrain Goldson and prevent his escape. (Id.) At 2:26 a.m. on October 5, 2013, Plaintiff Deputy Ryan Wedmore and Corporal Larry Meyer from the Brown County Sheriff's Office arrived at the scene. (Id., ¶ 25). Two officers from the Georgetown Police Department were present as well. (Id.) The officers subdued and

---

"I'm so f****** sad in here because like I said I am all done already after being locked up less than 2 weeks;"

"I cry myself to sleep every night because I know I lost you both;"

"I can't even write this letter because I'm breaking down after each line I write;"

"I'm hurting so bad right now & it f**** me up that I have not heard a word from you…;"

"I need you to come visit me a.s.a.p. I have done lost my girlfriend and feel like sh**;"

"I'm looking at 14 years 3 of my cases carry a mandatory 3 year sentence so regardless I'm not getting out until 2022 no matter what;"

"sad, mad, depressed and hurt;"

"don't forget about me, please;" and

"it's gonna break my heart."

In addition, those close to Goldson overheard him talking about how he would rather kill himself or hurt himself than go back to prison.

re-cuffed Goldson.   (Id., ¶ 23).

Goldson, after he was restrained, apologized for what he did and explained to officers that he had a sick child at home dying of SIDS.   (Id., ¶ 25).   Based on his recent history and comments that he had previously made regarding taking his life, officers believe that Goldson assaulted Deputy Justice in the hope that he would be shot so that he could avoid taking his own life.   (Id., ¶ 24).

At 2:32:28 a.m. on October 5, 2013, six minutes after Wedmore first learned that Goldson assaulted Deputy Justice, Goldson and the officers pulled into sally port at the Brown County Jail.   (Id., ¶ 27).   Jail surveillance footage shows Goldson's movements about the common areas of the jail, but cameras are not permitted to film inside the cells. (Id., ¶ 29).   At 2:32:54 a.m., Plaintiffs Corporal Jason Huff and Wedmore observed Goldson being placed in his cell by Plaintiffs Zane Schadle and Deputy George "Bill" Dunning.   (Id.)   Schadle and Dunning were in Goldson's cell for 96 seconds, removing his restraints and confiscating his shoes and blanket.   (Id., ¶ 28).   The officers left Goldson's cell at 2:34:30 a.m. and the cell door closed at 2:34:36 a.m.   (Id.)

Twenty-one minutes later, at 2:58:18 a.m. on October 5, 2013, Schadle found Goldson hanging from a knotted bed sheet wrapped around a steel pipe located between the ceiling and the escutcheon plate above the sprinkler head.   (Id., ¶ 30).   Correction Officer Sarah McKenzie and Dunning entered the cell with Schadle.   (Id., ¶ 31). Dunning immediately cut down Goldson while Schadle and McKenzie held Goldson. Upon being cut down, Goldson was handcuffed to guard against an assault.   (Id.) Schadle immediately performed CPR in attempt to resuscitate Goldson.   (Id.) McKenzie called the Communications Center for life squad.   (Id., ¶ 32).   Goldson was

pronounced dead by the responding EMS personnel at 3:11 a.m. (Id.)

The Sheriff's Office reported the in-custody death to Dr. Varnau. (Id.) The Sheriff's Office also requested an independent review of Goldson's death by the Ohio Bureau of Criminal Investigations ("BCI"). (Id., ¶ 33). All video surveillance was preserved and given to BCI for their investigation. (Id.)

Just after 11:00 a.m. on October 5, 2013, the Montgomery County Coroner's Office performed Goldson's autopsy. (Id., ¶ 34). Dr. Susan Allen, who is a forensic pathologist and certified in clinical, anatomic and forensic pathology, performed the autopsy. (Id.) The autopsy revealed a ligature mark and abrasions on the front of the neck, consistent with Goldson hanging himself with a bed sheet. There were also abrasions on his ankles, which were attributed to wearing shackles. (Id.) There was no other bruising or internal injuries. (Id.) Dr. Allen's opinion, to a reasonable degree of medical certainty, was that the cause of Goldson's death was "hanging by the neck" and consistent with a suicide. (Id.)

Dr. Kent Harshbarger, the Montgomery County Coroner who is also certified in clinical, anatomic and forensic pathology, reviewed the autopsy performed by Dr. Allen. (Id., ¶ 35). The first draft of the autopsy report specified hanging as the cause of death until Dr. Varnau expressed her disagreement. (Id.) The result of their discussion was a complete omission of the cause of death in the autopsy report. (Id.)

After hearing about Goldson's death, Dr. Varnau went to the Brown County jail and inspected Goldson's cell and began questioning the factual accounts of the events that had taken place that morning. (Id., ¶ 36). On October 6, 2013, Dr. Varnau reported Goldson's death to Jessica Little, the Brown County Prosecutor, and told Little that she

learned from an anonymous source that a deputy stated that there was going to be a "block party" for Goldson when he returned to jail after assaulting Deputy Justice. (Id., ¶ 37).

Fifty-three days later, on November 27, 2013, Dr. Varnau requested the video footage of the hallway adjacent from Goldson's cell. (Id., ¶ 38). The Sheriff's Office was unable to provide that footage because, as per standard operating procedure and automated controls in the video surveillance system, the footage had been taped over after thirty days. (Id.) However, BCI was still in possession of a copy of the requested footage, so Deputy John Schadle directed Dr. Varnau to get the video footage from BCI. (Id.)

On November 30, 2013, Dr. Varnau wrote on Goldson's death certificate that the manner of death was a homicide by strangulation. (Id., ¶ 39). Dr. Varnau specified that the strangulation was caused by a nylon leash, called a hobble strap, which is used by police officers as a restraint. (Id.) The Varnaus authored a "Coroner's Investigative Report on Death of Zachary Goldson—October 5, 2013" based on the information they collected from the investigation. (Id., ¶ 40). The Varnaus published this report knowing that BCI was still conducting its investigation and Prosecutor Daniel "Woody" Breyer had been appointed to present evidence for possible criminal charges against Plaintiffs to the grand jury. (Id.)

The Varnau's report indicated that the evidence clearly demonstrates that Goldson could not have committed suicide. The report stated that Goldson was found hanging from the sprinkler head, which can only bear forty pounds. (Id., ¶ 41). However, Goldson was found hanging from a bed sheet wrapped around a steel pipe between the

escutcheon plate and the ceiling.   (Id.)   According to the Varnaus' report, Goldson would not have been able to tie the bed sheet to the sprinkler assembly in less than six minutes.   (Id., ¶ 42).   The report cites to an anonymous consultant who said that he was not able to fasten a sheet to the sprinkler without falling down.   (Id.)   The report also referenced four tight knots in the bed sheet, even though the BCI investigation did not indicate there were any knots in the bed sheet.   (Id.)   The report concludes that Goldson's cell was staged prior to Goldson's return.   (Id.)

The report also accused Plaintiff John Schadle of destroying evidence and covering up Goldson's murder by replacing the sprinkler head in Goldman's cell.   (Id., ¶ 47).   The Varnaus also called into question the actions of Officer Schadle upon finding Goldson, denying that he cuffed Goldson before administering CPR.   (Id., ¶ 48).   The report notes, "[i]f CO Schadle was concerned about Mr. Goldson coming to in a fighting condition, it would have been much quicker to attach handcuffs to one hand and the other to the clevis on the bunk wall, allowing Mr. Goldson to lie on his back for CPR."   (Id.)

Upon examination of the body in their livor mortis analysis, the Varnaus concluded that Goldson must have died on his backside due to the lack of sufficient blood pooling on the feet and legs, and more than expected pooling on the posterior side of Goldson's body.   (Id., ¶ 49).   The report does not state when the livor mortis analysis was conducted.   (Id.)   The examination by Drs. Allen and Harshbarger revealed nothing inconsistent with suicide.   (Id.)   The Varnau report also questions whether the noose was the strangulation device because the Varnaus found a matrix patter imprint on the side of Goldson's neck, which would be consistent with a nylon hobble strap.   (Id., ¶ 50).   The Varnaus explained that they conducted interviews with ex-inmates at the Brown

7

County Jail who told them that the officers would tie hobble straps around their necks and lead them like dogs. (Id.) Drs. Allen and Harshbarger did not find a matrix patter imprint on Goldson's neck. (Id.)

The Varnaus contacted newspapers and television stations criticizing the Sheriff's Office of their handling of the video footage. (Id., ¶ 59). Dr. Varnau was quoted as saying, "[n]ormally in any potential homicide investigation video recorders would be immediately quarantined by law enforcement personnel, including the Sheriff's Office in this case, so that it could not be accessed in any way immediately upon discovery of a death in the jail." (Id.) Further, Dr. Varnau stated to the press that Chief Deputy Schadle took inappropriate actions to "protect his murdering son." (Id.)

In addition, the Varnaus' report was published by news agencies and the Varnaus gave statements to the press before the grand jury had ruled on whether or not to indict any law enforcement officers. (Id., ¶ 56). Further, the Varnaus named specific officers to the press, sent emails with attachments and their investigatory findings to BCI, and sent the coroner's report including surveillance footage, phone calls and autopsy and scene photos to the press. (Id. ¶¶ 61-63). Their findings and reports were also published on the Varnau's website www.varnau.us. (Id. ¶ 70).

On December 11, 2014, the grand jury returned with a no bill because they did not find sufficient probable cause to indict any of the Plaintiffs. (Id., ¶ 58).

Plaintiffs claim that as a result of the Varnaus' actions, Plaintiffs have been referred to as the "Death Squad" by the community. Plaintiffs also claim that the citizens of Brown County have been uncooperative with law enforcement, and labeled them as murderers, manipulative and corrupt. Further, Plaintiffs' children have been harassed at

school by their peers.

Plaintiffs bring six claims against Defendants: (1) 42 U.S.C. § 1983; (2) 42 U.S.C. § 1985; (3) Defamation; (4) Civil Conspiracy; (5) Amendment of Coroner's Verdict; and (6) Punitive Damages. Plaintiffs have brought their claims against the Varnaus in their individual and official capacity. Plaintiffs' claim for amendment of coroner's verdict is brought only against Dr. Varnau.

## II. __ANALYSIS__

### A. __Standard of Review__

Defendants have moved for dismissal based on lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and the failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

"Challenges to subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) 'come in two varieties: a facial attack or a factual attack.'" *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 440 (6th Cir. 2012) (quoting *Gentek Bldg. Prod., Inc. v. Sherwin–Williams C*o., 491 F.3d 320, 330 (6th Cir. 2007)). A facial attack challenges the sufficiency of the pleading and goes to whether or not the plaintiff laid a sufficient basis for subject matter jurisdiction. *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014). All of the allegations in a facial analysis must be taken as true, like that of a 12(b)(6) motion. *Carrier*, 673 F.3d at 440; *see also Lovely v. United States*, 570 F.3d 778, 781 (6th Cir. 2009), *cert. denied*, 558 U.S. 1111 (2010). A factual attack, on the other hand, challenges the actual existence of subject matter jurisdiction. *Cartwright*, 751 F.3d at 759. In a factual attack, the court may "weigh evidence to confirm the existence of the factual predicates for subject-matter jurisdiction." *Carrier*, 673 F.3d at 440. "Plaintiff

bears the burden of establishing that subject matter jurisdiction exists."  *Cartwright*, 751 F.3d at 760.

In reviewing a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), this Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true and draw all reasonable inferences in favor of the plaintiff."  *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (quoting *Directv, Inc. v Treesh*, 487 F.3d 471, 476 (6th Cir. 2007)).  However, legal conclusions conveyed as factual allegations do not be accepted as true, rather the reviewing court is allowed to draw on its own judicial experience and common sense in determining whether or not the pleader can obtain any relief based on the purported facts. *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949-950 (2009).

"[T]o survive a motion to dismiss a complaint must contain (1) 'enough facts to state a claim to relief that is plausible,' (2) more than 'a formulaic recitation of a cause of action's elements,' and (3) allegations that suggest a 'right to relief above a speculative level.'"  *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 129 S.Ct. at 1949.  Although the plausibility standard is not equivalent to a "'probability requirement' . . .it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id*. at 1949 (quoting *Twombly*, 550 U.S. at 556).

### B. Brown County

The County argues that Plaintiffs' allegations in the Amended Complaint fail to

state a claim against them, and dismissal is proper under Federal Rule of Civil Procedure 12(b)(6).

    1.  **Section 1983**

For a county to be liable under 42 U.S.C. § 1983, a plaintiff must show that the alleged injuries were inflicted pursuant to a governmental custom, policy or practice. *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658 (1978) (explaining that a county policy must have been a moving force behind the alleged constitutional violation). A plaintiff may show that the municipality was responsible in four ways: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013).   Plaintiffs argue that Dr. Varnau, and by some unspecified extension, Dennis Varnau have final decision-making authority for the County.

"[A] municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."   *Monell*, 436 U.S. at 691.   Instead, "[m]unicipal liability may attach for policies promulgated by the official vested with final policymaking authority for the municipality."   *Miller v. Calhoun Cnty.*, 408 F.3d 803, 813 (6th Cir. 2005) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 482-83, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)).   For a decision by a municipal official to be considered a "policy" decision, state or local law must give the official the authority to choose from various alternatives when making that particular decision.   *Pembaur,* 475 U.S. at 483.   Whether an official is a "policymaker" is

11

a question of state law.  *Id.*

The County argues that Plaintiffs' Amended Complaint fails to allege facts to support the conclusion that Dr. Varnau is a county policymaker.

In *Jorg v. City of Cincinnati*, the Sixth Circuit found that a county coroner is not acting as a policymaker when determining and reporting causes of death. 145 Fed.Appx. 143, 147 (6th Cir. 2005). The court noted that state law "clearly mandates that the Coroner must determine the cause of death." *Id.* (citing Ohio Rev. Code Ann. § 313.09). The court explained that "[w]hen municipal officials have been deemed to be making policy decisions in the past, it has not been because they were vested with the authority to make factual assessments of a particular situation, but rather, because they were vested with the authority to respond to that situation." *Id.* at 146-47. "Accordingly, there is a distinction between "policymaking" authority, which entails a certain amount of discretion to choose among various plausible alternatives, and 'factfinding' authority, which involves assessing the fixed realities of a situation." *Id.* at 147 (citing Merriam Webster's Collegiate Dictionary 416 (1995) (defining "fact finder" as "one that tries to determine the realities of a case, situation . . . an impartial examiner designated by a government agency to appraise the facts underlying a particular matter")). Thus, while other activities of the coroner might constitute policymaking, determining the cause of death is not one of them. *Id.* The court explained:

> Any malfeasance on the Coroner's part therefore did not result from him exercising vested policymaking authority. While he may have "chosen" to falsify the report, as alleged, the state and local laws do not offer him any discretion to take this course of conduct after the initial factual determination is made.

*Id.*

Plaintiffs attempt to distinguish *Jorg* by arguing that their claim is not solely based on Dr. Varnau's determination regarding the cause of death. Instead, Plaintiffs argue, Dr. Varnau exercised her policymaking authority by using her website to post and solicit information regarding the Goldson death, misconstrued facts obtained through her investigation, accused innocent people of murder, and used the coroner's office to further her family feud with the Sheriff. Plaintiffs argue that state law gives the coroner discretion to solicit sources of information and determine the manner in which to investigate the death.

However, "mere authority to exercise discretion while performing particular functions does not make a municipal employee a final policymaker unless the official's decisions are final and unreviewable and are not constrained by the official policies of superior officials." *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993) (citing *City of St. Louis v. Praprotnik*, 485 U.S.112,t 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988)). "Discretion to act is not to be confused with policymaking authority; no municipal liability results where an official merely has discretion to act because subjecting a municipality to liability in such a situation would be 'indistinguishable' from respondeat superior liability." *Id.* (citation omitted). The court in *Jorg* specifically addressed similar acts of publicizing false information:

> although Jorg claims that the Coroner's misconduct included his publicizing the false cause of death, Jorg has pointed to no state or local law which vests the Coroner with any policymaking authority in this regard. If the Coroner answered the City Council's questions about Owensby's cause of death, these statements are outside the realm of his statutory duties. Moreover, the most damaging conduct by the Coroner would be his alleged falsification of the autopsy report, and the report is automatically public record. Ohio Rev.Code Ann. § 313.10. As previously discussed, the Coroner was not a policymaker with regards to his cause of death determinations.

*Id*.  Moreover, Dr. Varnau's misuse of her power to advance a private agenda does not

create a "policy or custom" of the county.  *See Wooten v. Logan*, 92 Fed.Appx. 143,

145-47 (6th Cir. 2004) (rape committed by a county sheriff could not be considered part of

the county's "policy or custom.").   Therefore, the Court concludes that Plaintiffs cannot

maintain their Section 1983 claim against the County.

### 2. <u>Section 1985</u>

Section 1985 prohibits conspiracies interfering with civil rights.   42 U.S.C. § 1985.

Plaintiffs contend that Defendants' conspiracy to incite governmental prosecution against

them prevented "them from performing their duties by making the public believe the false

accusations against them, specifically, causing Zachary Goldson's death, and tampering

with evidence."   (Doc. 10, ¶ 89).   This claim is ostensibly brought pursuant to the first

section of 42 U.S.C. § 1985:

> (1) Preventing officer from performing duties.
>
> If two or more persons in any State or Territory conspire to prevent, by
> force, intimidation, or threat, any person from accepting or holding any
> office, trust, or place of confidence under the United States, or from
> discharging any duties thereof; or to induce by like means any officer of the
> United States to leave any State, district, or place, where his duties as an
> officer are required to be performed, or to injure him in his person or
> property on account of his lawful discharge of the duties of his office, or
> while engaged in the lawful discharge thereof, or to injure his property so as
> to molest, interrupt, hinder, or impede him in the discharge of his official
> duties . . .

42 U.S.C. § 1985(1).   As one district court has recently explained:

> The overwhelming weight of authority holds that Section 1985(1) is not
> applicable when the plaintiff is not a federal officer.   *See Dallas v. Holmes*,
> 137 F. App'x 746, 752 n. 5 (6th Cir. 2005) (holding that Section 1985(1)
> prohibits interference with the official duties of federal officers); *Bennett v.
> Batchik*, 191 U.S.App. LEXIS 13685, at *20, 1991 WL 110385 (6th Cir.
> 1991) (holding that Section 1985(1) claims relate specifically to federal

14

officers); *Benningfield v. City of Houston*, 157 F.3d 369, 378 (5th Cir. 1998) ("§ 1985(1) applies in cases of interference with federal officials in the performance of their duties. § 1985(1) is not applicable to state officials."); *Canlis v. San Joaquin Sheriff's Posse Comitatus*, 641 F.2d 711, 717 (9th Cir. 1981) ("There is nothing in the language of the statute nor in the legislative history to support ... that § 1985(1) does not apply exclusively to federal officers.").

*Trayer v. Klopfenstein*, No. 3:13 CV 2581, 2014 WL 3543779, at *2 (N.D. Ohio July 16, 2014). Plaintiffs do not allege that they are federal officers. Therefore, Plaintiffs have failed to state a claim under 42 U.S.C. § 1985(1) against the County.

### 3. State law claims

The County argues that it is entitled to immunity from Plaintiffs' state law claims of civil conspiracy and defamation under Ohio's Political Subdivision Tort Liability Act.

The Sixth Circuit has explained that under this Act:

Ohio uses a three-tier analysis to determine if a person or entity is immune. *Lambert [v. Clancy],* 927 N.E.2d at 588. Under Tier 1, political subdivisions and their employees receive a general grant of immunity for acts in connection with a government function. *Id.*; *see also* Ohio Rev. Code Ann. § 2744.02(A)(1) (2013). Tier 2 lists five exceptions to this immunity. *Lambert*, 927 N.E.2d at 588; *see also* Ohio Rev. Code Ann. § 2744.02(B). If an exception applies, courts then look to Tier 3 to see if immunity is reinstated under any of the defense provisions in Ohio Revised Code § 2744.03. *Lambert*, 927 N.E.2d at 588.

*Range v. Douglas*, 763 F.3d 573, 582-83 (6th Cir. 2014).

There is no dispute that the County is entitled to a general grant of immunity under Ohio Revised Code § 2744.02(A)(1). However, Plaintiffs argue that in Tier 2, the second exception applies. This exception to the general grant of immunity reads: "Except as otherwise provided in sections 3314.07 and 3746.24 of the Revised Code, political subdivisions are liable for injury, death, or loss to person or property caused by the negligent performance of acts by their employees with respect to proprietary functions of

the political subdivisions." Ohio Rev. Code § 2744.02(B)(2). Plaintiffs point to two "proprietary functions" which form the basis of the exception: (1) creating and maintaining a website and (2) drafting and disseminating materials through a website and to the press.

However, as this Court has previously recognized, under Ohio law, defamation is classified as an intentional tort, and Ohio courts have held that there are no exceptions to immunity for intentional torts. *Weldon v. Warren Cnty. Children Servs.*, No. 1:12-CV-279-HJW, 2012 WL 5511070, at *10 (S.D. Ohio Nov. 14, 2012) (citing *Cooper v. Grace Baptist Church*, 81 Ohio App.3d 728, 737, 612 N.E.2d 357 (Ohio Ct. App, 1992); *Holzbach v. Jackson Twp.*, 2000 WL 1035798 (Ohio App. 5 Dist.), discretionary review denied, 90 Ohio St.3d 1468, 738 N.E.2d 381 (2000)). Plaintiffs have not explained how the intentional acts which form the basis of their defamation claim involved the "negligent" performance of a proprietary function. Therefore, the exception found in Ohio Revised Code § 2744.02(B)(2) does not apply to Plaintiffs' claim for defamation.

Similarly, this Court has explained:

A civil conspiracy by its very nature requires an agreement. Black's Law Dictionary (8th ed. 2004 Westlaw). An agreement to commit negligence is not possible and, as such, a civil conspiracy must be a conspiracy to commit some type of underlying intentional tort. *See Bevan Group 9 v. A-Best Products Co.*, 2004 WL 1191713 (Ohio Common Pl., Cuyahoga County, May 17, 2004) ("... Ohio law deems civil conspiracy an intentional tort"); *Gosden v. Louis*, 116 Ohio App.3d 195, 687 N.E.2d 481, 496-97 (1996).

*Chesher v. Neyer*, 392 F. Supp. 2d 939, 959 (S.D. Ohio 2005) *aff'd*, 477 F.3d 784 (6th Cir. 2007). Therefore, the exception found in Ohio Revised Code § 2744.02(B)(2) does not apply to Plaintiffs' claim for civil conspiracy under Ohio law.

Because the exception to the grant of political subdivision immunity found in Ohio

Revised Code § 2744.02(B)(2) does not apply, the immunity analysis need not go any further.   *Accord Weldon v. Warren Cnty. Children Servs.*, No. 1:12-CV-279-HJW, 2012 WL 5511070, at *10 (citing *Hortman v. Miamisburg*, 110 O.St.3d 194, 197, 852 N.E.2d 716 (2006).   Therefore, Plaintiffs' state law claims for civil conspiracy and defamation against the County are barred due to political subdivision immunity.

In summary, the Court finds that Plaintiffs have failed to state a claim against the County and dismissal of the claims against the County is proper under Federal Rule of Civil Procedure 12(b)(6).

### C. **The Varnaus**

The Varnaus challenge this Court's jurisdiction to hear Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(1); and also argue that Plaintiffs have failed to state a claim under Federal Rule of Civil Procedure 12(b)(6).   The Court will address the jurisdiction issues first, and then analyze Plaintiffs' claims under Rule 12(b)(6).

### 1. **Amendment of Coroner's Verdict**

Plaintiffs seek to amend the Coroner's verdict pursuant to Ohio Revised Code § 313.19, which provides:

> The cause of death and the manner and mode in which the death occurred, as delivered by the coroner and incorporated in the coroner's verdict and in the death certificate filed with the division of vital statistics, shall be the legally accepted manner and mode in which such death occurred, and the legally accepted cause of death, unless the court of common pleas of the county in which the death occurred, after a hearing, directs the coroner to change his decision as to such cause and manner and mode of death.

Ohio Rev. Code § 313.19.   The Supreme Court of Ohio has explained that "the court of common pleas has jurisdiction to both hear and determine the type of factual questions raised in an R.C. 313.19 action."   *Perez v. Cleveland*, 66 Ohio St. 3d 397, 399, 613

N.E.2d 199, 201 (1993); *see also State ex rel. Blair v. Balraj*, 69 Ohio St.3d 310, 631 N.E.2d 1044, 1048 (Ohio 1994) ("an action for declaratory judgment in the court of common pleas [is] the way to implement R.C. 313.19's hearing provisions in a case where plaintiff sought to have the coroner's verdict changed from 'homicide' to 'natural causes.'").  Therefore, the Court finds that it does not have jurisdiction to amend the Coroner's verdict pursuant to Ohio Revised Code § 313.19.

### 2. __Abstention__

The Varnaus argue that this Court should abstain from deciding Plaintiffs' claims der the *Pullman* and the *Rooker-Feldman* abstention doctrines.

*Pullman* abstention is derived from the Supreme Court's decision in *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 500-501 (1941).  Application of the *Pullman* abstention doctrine "is warranted only when a state law is challenged and resolution by the state of certain questions of state law may obviate the federal claims, or when the challenged law is susceptible of a construction by state courts that would eliminate the need to reach the federal question."  *GTE N., Inc. v. Strand*, 209 F.3d 909, 921 (6th Cir. 2000).  Aside from Plaintiffs' claim pursuant to Ohio Revised Code § 313.19, Plaintiffs do not raise challenges to the determination of the cause of death.  Instead, Plaintiffs challenge the way in which that determination was reached in Goldson's case.

Plaintiffs claim the Varnaus improperly exerted pressure, knowingly provided misinformation, concealed exculpatory evidence, or otherwise engaged in wrongful or bad faith conduct that resulted in the initiation of legal proceedings.  Plaintiffs also claim that the Varnaus made false statements to the press and specifically implicated Plaintiffs

in Goldson's death.   Plaintiffs' claims appear to be about the manner of the investigation, not the decision itself.   Since Plaintiffs' remaining claims are limited to the actions the Varnaus took while conducting their investigation, there exists no question of state law. Therefore, the *Pullman* abstention does not apply.

The *Rooker-Feldman* doctrine "is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments."   *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005).   Plaintiffs in this case are not complaining of injuries caused by a judgment rendered by the state court prior to the commencement of district court proceedings.   Therefore, the Court finds that the *Rooker-Feldman* doctrine does not apply.

Accordingly, the Court will not abstain from exercising jurisdiction over Plaintiffs' claims.   *Accord Elfers v. Varnau*, No. 1:14CV171, 2015 WL 1476746, at *2 (S.D. Ohio Mar. 31, 2015).

### 3. <u>Absolute Immunity</u>

The Varnaus claim that they are entitled to absolute immunity from Plaintiffs' constitutional claims because those claims stem from the Varnaus' actions taken while working within the scope of their official positions as Coroner and Coroner's designee. The Varnaus argue that making a determination regarding the cause of death is a quasi-judicial duty, which is shielded by absolute immunity.   The Varnaus also argue that one who acts under the direction of an absolutely immune official is likewise protected under the doctrine of quasi-judicial immunity.

19

"A government officer is entitled to absolute immunity for performing functions 'intimately associated with the judicial phase of the criminal process.'" *Adams v. Hanson*, 656 F.3d 397, 401 (6th Cir. 2011) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)). The Sixth Circuit has explained that under this "functional approach" an official's "acts undertaken in direct preparation of judicial proceedings . . . warrant absolute immunity, whereas other acts, such as the preliminary gathering of evidence that may ripen into a prosecution, are too attenuated to the judicial process to afford absolute protection." *Adams*, 656 F.3d at 402 (quoting *Ireland v. Tunis*, 113 F.3d 1435, 1445 (6th Cir.1997)). The Sixth Circuit has cautioned: "Using this approach, courts must look to the nature of the function performed, not the identity of the actor who performed it." *Koubriti v. Convertino*, 593 F.3d 459, 467 (6th Cir. 2010) (internal quotation marks and citation omitted).

Here, Dr. Varnau was not giving testimony at an adversarial proceeding and her decision regarding Goldson's cause of death was not taken in direct preparation for judicial proceedings. The Ohio Supreme Court has described the role of a coroner in determining the cause of death as "a medical expert rendering an expert opinion on a medical question." *Vargo v. Travelers Ins. Co.*, 516 N.E.2d 226, 229 (Ohio 1987). To the extent Plaintiffs' claims are based upon Dr. Varnau's determination of Goldson's cause of death, the doctrine of absolute immunity offers "no protection to pretrial conduct, including the fabrication of evidence later adopted in trial testimony; that receives only qualified-immunity protection." *LeFever v. Ferguson*, 567 Fed.Appx. 426, 430 (6th Cir. 2014) (citing *Gregory v. City of Louisville*, 444 F.3d 725, 738 (6th Cir. 2006) (finding toxicologist entitled to absolute immunity because no evidence of pretrial conduct

supporting fabrication claim)).

Therefore, the Court finds that the Varnaus are not entitled to absolute immunity from Plaintiffs' constitutional claims.

### 4. **Qualified Immunity**

Qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Sixth Circuit has explained:

> To determine whether a government official is entitled to qualified immunity, we consider the two-part test described in *Saucier v. Katz*, which asks whether "a constitutional right would have been violated on the facts alleged" and, if so, whether the right was "clearly established." 533 U.S. 194, 200-01, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). We are free to address the second question first, analyzing whether the constitutional right that purportedly prohibited a defendant's conduct was clearly established, without addressing whether there was a constitutional violation at all. *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

*Occupy Nashville v. Haslam*, 769 F.3d 434, 442 (6th Cir. 2014) (footnote omitted).

Plaintiffs' claims under Section 1983 are based on violations of their Fourteenth Amendment substantive and procedural due process rights.

### i. **Procedural due process**

The Fourteenth Amendment provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "To establish a procedural due process claim, a plaintiff must show that (1) it had a life, liberty, or property interest protected by the Due Process Clause; (2) it was deprived of this protected interest; and (3) the state did not afford it adequate procedural rights."

*Daily Servs., LLC v. Valentino*, 756 F.3d 893, 904 (6th Cir. 2014) (citing *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006)). "Although property rights are principally created by state law, 'whether a substantive interest created by the state rises to the level of a constitutionally protected property interest is a question of federal constitutional law.'" *Waeschle v. Dragovic*, 576 F.3d 539, 544 (6th Cir. 2009) (quoting *Whaley v. County of Tuscola*, 58 F.3d 1111, 1114 (6th Cir.1995)).

"Governmental employees may have a property interest in continued employment, in which case they must be afforded due process before being discharged." *Pucci v. Nineteenth Dist. Court*, 628 F.3d 752, 765 (6th Cir. 2010) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985)). However, Plaintiffs do not allege that any officers were discharged or disciplined in any way as a result of the Varnaus' actions.

Plaintiffs argue that they have had difficulty finding employment elsewhere and under *Paul v. Davis*, 424 U.S. 693, 96 S. Ct. 1155, 47 L. Ed. 2d 405 (1976), the Supreme Court found that defamation can cause a deprivation of a property right. However, in *Paul v. Davis*, the Court was clear that it is not "sufficient to establish a claim under § 1983 and the Fourteenth Amendment that there simply be defamation by a state official; the defamation had to occur in the course of the termination of employment." *Id*. at 710 (discussing *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). Plaintiffs have not alleged that the Varnaus made defamatory statements in the course of the termination of their employment. Defamation alone is not enough to establish a liberty or property interest. *Mertik v. Bialock*, 983 F. 2d 1353 (6th Cir. 1993) ("Injury to reputation, standing alone, is not a liberty interest protected by the Fourteenth

Amendment" and "[d]efamatory publications, standing alone, do not rise to the level of a constitutional claim, no matter how serious the harm to reputation.").

Therefore, the Court finds that based the facts alleged, Plaintiffs have failed to state a claim against the Varnaus for a violation of their procedural due process rights.

### ii. __Substantive due process__

Substantive due process protects against "certain government actions regardless of the fairness of the procedures used to implement them." *Range v. Douglas*, 878 F. Supp. 2d 869, 877 (S.D. Ohio 2012) (citing *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). "To state a cognizable substantive due process claim, the plaintiff must allege 'conduct intended to injure in some way unjustifiable by any government interest' and that is 'conscience-shocking' in nature." *Mitchell v. McNeil*, 487 F. 3d 374, 376 (6th Cir. 2007) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 848, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)). As the Sixth Circuit has explained:

> Over the years, the courts have used several tropes to explain what it means to shock the conscience. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846–47, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). Conduct shocks the conscience if it "violates the 'decencies of civilized conduct.'" *Id.* at 846, 118 S.Ct. 1708 (quoting *Rochin v. California*, 342 U.S. 165, 172-73, 72 S.Ct. 205, 96 L.Ed. 183 (1952)). Such conduct includes actions "so 'brutal' and 'offensive' that [they do] not comport with traditional ideas of fair play and decency." *Id.* at 847, 118 S.Ct. 1708 (quoting *Breithaupt v. Abram*, 352 U.S. 432, 435, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957)). These are subjective standards, to be sure, but they make clear that the "shocks the conscience" standard is not a font of tort law, but is instead a way to conceptualize the sort of egregious behavior that rises to the level of a substantive due process violation. *See id.* at 847–48, 118 S.Ct. 1708.

*Range v. Douglas*, 763 F.3d 573, 589-590 (6th Cir. 2014).

In another case brought against the Varnaus, this Court found that allegations that the Varnaus made a false determination regarding the cause of death so as to prevent the

23

Brown County Sheriff from conducting further investigation did not "shock the conscience." *Elfers v. Varnau*, No. 1:14CV171, 2015 WL 1476746, at *7 (S.D. Ohio Mar. 31, 2015) (citing *Johnson v. Barker*, 799 F.2d 1396, 1400 (9th Cir. 1986) (allegation that sheriff and prosecutors pursued baseless criminal charges for "political" reasons was not so egregious as to "shock the conscience"); *Cruz–Erazo v. Rivera–Montanez*, 212 F.3d 617 (1st Cir. 2000) (allegation that police officers verbally harassed and intimidated homeowners, occupied their property without permission, deliberately lied in official documents, and perjured themselves in official court proceedings with intention of causing homeowners harm did not sufficiently "shock the conscience" so as to violate substantive due process); *Cusick v. City of New Haven*, 145 Fed.Appx. 701, 702–703 (2d Cir. 2005) ("Assuming arguendo that the plaintiffs' evidence was sufficient to demonstrate that the defendants intended to harm them by withholding information from the North Haven police—a questionable supposition—this conduct still would not constitute the kind of heinous behavior recognized in the law as 'conscience-shocking.'")).

Plaintiffs claim that the Varnaus improperly exerted pressure, knowingly provided misinformation, concealed exculpatory evidence, or otherwise engaged in wrongful or bad faith conduct that resulted in the initiation of legal proceedings against Plaintiffs. Specifically, Plaintiffs have alleged: (1) the Varnaus sent emails to the Attorney General's office and to Special Prosecutor Breyer in an effort to exert pressure on them to charge Plaintiffs in connection with Goldson's death; (2) the Varnaus also exerted pressure on Dr. Harshbarger to amend his autopsy findings; (3) the Varnaus deliberately fabricated certain facts and concealed others in their reports to make it look as if Plaintiffs were murderers and Goldson did not hang himself; and (4) the Varnaus falsified forensic

findings by stating that there was a matrix pattern imprint on Goldson's neck and deliberately misconstrued the livor mortis findings.

In support of their claim, Plaintiffs cite to *Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119, 1126 (9th Cir. 2002), in which the Ninth Circuit held that "a coroner's reckless or intentional falsification of an autopsy report that plays a material role in the false arrest and prosecution of an individual can support a claim under 42 U.S.C. § 1983 and the Fourth Amendment." However, the court was clear that it was analyzing the case under the Fourth Amendment, not the Fourteenth Amendment. *See Galbraith*, 307 at 1127 ("Fourth Amendment principles, and not those of due process, govern this case."). Here, Plaintiffs have not alleged that they arrested or prosecuted. The only allegation is that the false information provided by the Varnaus resulted in a referral of charges to the grand jury, which returned a no bill.

Therefore, the Court finds that based on the facts alleged, Plaintiffs have failed to state a claim against the Varnaus for a violation of their substantive due process rights.

### 5. <u>Section 1985</u>

As explained above, 42 U.S.C. § 1985(1) is not applicable when the plaintiff is not a federal officer. Therefore, Plaintiffs have failed to state a claim under 42 U.S.C. § 1985(1) against the Varnaus.

### 6. <u>State law claims</u>

### i. <u>Immunity under Ohio Revised Code § 2744.03(A)(6)</u>

The Varnaus make a brief argument that they are entitled to statutory immunity from Plaintiffs' state law claims for civil conspiracy and defamation.

Ohio Revised Code § 2744.03(A)(6) provides:

(6) In addition to any immunity or defense referred to in division (A)(7) of this section and in circumstances not covered by that division or sections 3314.07 and 3746.24 of the Revised Code, the employee is immune from liability unless one of the following applies:

. . .

(b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner

Ohio Rev. Code § 2744.03.   Plaintiffs have sufficiently alleged that the Varnaus' acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner:

"Dr. Varnau willfully and intentionally mislead the public into believing that the Plaintiffs deliberately refrained from preserving the necessary video imagery…" (Doc. 10, ¶ 60).

"The Varnaus released this information knowing that the press would widely disseminate their false accusations" (Doc. 10, ¶ 63).

"Defendants knowingly and maliciously disseminated false circumstances surrounding Goldson's death in a conspiratorial attack to personally and professionally ruin Plaintiffs" (Doc. 10, ¶ 66).

Therefore, the Court concludes that the Varnaus are not entitled to statutory immunity under Ohio Rev. Code § 2744.03.   However, the Varnaus argue that Plaintiffs have failed to state a claim against them for either defamation or civil conspiracy.

**ii.**   **Defamation**

In Ohio, the tort of defamation has four elements: "a false and defamatory statement concerning another; unprivileged publication to a third party; fault amounting to at least negligence by the publisher; actionability of the statement irrespective of a special harm or the existence of a special harm."   *Akron-Canton Waste Oil, Inc. v. Safety-Kleen Oil Serv., Inc.*, 81 Ohio App.3d 591, 601, 611 N.E.2d 955, 962 (1992) (quoting 3 Restatement of the Law2d Torts § 558, pg. 155 (1977)).

The Varnaus claim that any statements they made were made in their capacity as

Coroner and the Coroner's designee, and therefore a qualified privilege attaches to them.

As one Ohio court has explained:

> No single statement or formula can sufficiently describe when publication of defamatory matter should be conditionally or qualifiedly privileged.  It is generally agreed, however, that * * * [a] publication is privileged when it is 'fairly made by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of his own affairs, in matters where his interest is concerned.'
>
> " ' " ' * * * The essential elements of a conditionally privileged communication may accordingly be enumerated as good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only. The privilege arises from the necessity of full and unrestricted communication concerning a matter in which the parties have an interest or duty, and is not restricted within any narrow limits.' " '
>
> " * * * [T]he privilege does not attach to the communication, but to the occasion on which it is made."  (Citations omitted.)  *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council* (1995), 73 Ohio St.3d 1, 7-9, 651 N.E.2d 1283, 1290.

*Kremer v. Cox*, 114 Ohio App. 3d 41, 62-63, 682 N.E.2d 1006, 1020 (1996).   "When a defendant possesses a qualified privilege regarding statements contained in a published communication, that privilege can be defeated only by a clear and convincing showing that the communication was made with actual malice."   *Id.* at 63.   In this context, actual malice is defined as "acting with knowledge that the statements were false or acting with reckless disregard as to their truth or falsity."   Here, Plaintiffs adequately allege that the Varnaus' defamatory statements were made with actual malice.   Therefore, at this stage of the proceedings, based on the allegations in the Amended Complaint, Plaintiffs have stated a claim of defamation against the Varnaus.

### iii.   Civil conspiracy

The Supreme Court of Ohio defines civil conspiracy as "'a malicious combination

of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages.' " *Aetna Cas. & Sur. Co. v. Leahey Const. Co.*, 219 F.3d 519, 534 (6th Cir. 2000) (quoting *Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St.3d 415, 650 N.E.2d 863, 866 (1995).   To state a claim of civil conspiracy, the following elements must be proven: "(1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy."   *Id.* (quoting *Universal Coach, Inc. v. New York City Transit Auth., Inc.*, 90 Ohio App.3d 284, 629 N.E.2d 28, 33 (1993)).

Plaintiffs allege that the Varnaus "participated in a malicious combination involving two or more persons, resulting in the unlawful act of attributing Plaintiffs responsible for Goldson's death, and that they tampered with evidence to cover for those who did cause Zachary Goldson's death."   (Doc. 10, ¶ 99).   These allegations are sufficient to support a claim for civil conspiracy.   However, the Varnaus argue that Plaintiffs claims are barred by the intra-conspiracy doctrine.

"The intra-corporate conspiracy doctrine provides that employees of a corporation or governmental entity cannot conspire among themselves because they are treated as one entity."   *Nuovo v. The Ohio State Univ.*, 726 F. Supp. 2d 829, 845 (S.D. Ohio 2010) (citing *Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.*, 926 F.2d 505, 509 (6th Cir. 1991)).   The doctrine has been applied to the Ohio common law civil conspiracy claim.   *Id.* (citing *Lutz v. Chesapeake Appalachia, L.L.C.*, No. 4:09CV2256, 2010 WL 2541669, at *5 n. 13 (N.D.Ohio June 18, 2010)).   However, an exception to the doctrine exists when the challenged activity takes place outside the scope of employment. *Johnson v. Hills & Dales General Hosp.*, 40 F.3d 837 (6th Cir. 1994).   Plaintiffs have

28

alleged that the underlying defamation took place outside the scope of the Varnau's employment.

Therefore, the Court concludes that at this stage of the proceedings, based on the allegations in the Amended Complaint, Plaintiffs have stated a claim against the Varnaus for civil conspiracy under Ohio law.

## III.   CONCLUSION

Based on the foregoing, it is hereby **ORDERED** that:

1. Defendant Brown County's Motion to Dismiss (Doc. 12) is **GRANTED**;

   a. Brown County and the Brown County Commissioners are DISMISSED as a party;

   b. The claims brought against Judith A. Varnau and Dennis Varnau in their official capacity are DISMISSED;

2. Defendants Judith and Dennis Varnau's Motion to Dismiss (Doc. 14) is **GRANTED in PART and DENIED in PART**;

   a. Plaintiffs' claims against the Varnaus under 42 U.S.C. § 1983 and 42 U.S.C. § 1985 are DISMISSED for failure to state a claim; Plaintiffs' claim for Amendment of Coroner's Verdict is DISMISSED for lack of jurisdiction;

   b. Plaintiffs' claims for defamation and civil conspiracy under Ohio law remain pending.

**IT IS SO ORDERED.**

_____/s/ Michael R. Barrett_____
Michael R. Barrett
United States District Judge